UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
LAURIE A. DICKEY,                                       Chapter 7
                    DEBTOR.                             Case No. 13-10318-WCH

_____

**MEMORANDUM OF DECISION**

## I. INTRODUCTION

The matters before the Court are the motions to avoid judicial liens (collectively, the "Lien Avoidance Motions") filed by Laurie A. Dickey (the "Debtor") and the oppositions thereto filed by filed by New England Phoenix Co., Inc. ("NEPCO") and Ridgewood Partners, LLC ("Ridgewood").  The Debtor seeks to avoid five judicial liens pursuant to 11 U.S.C. § 522(f) as encumbering her homestead exemption on certain real property located in Chatham, Massachusetts.  Both NEPCO and Ridgewood oppose the avoidance of their respective liens, asserting that the fair market value of the property in question is substantially higher than alleged by the Debtor.  I conducted an evidentiary hearing on October 24, 2014, at which three witnesses testified.[1]  For the reasons set forth below, I will grant the motions to avoid the liens junior to NEPCO, grant in part and deny in part the motion to avoid NEPCO's lien, and deny the motion to avoid Ridgewood's lien.

_____

[1] Notwithstanding any lack of express reference below, I have reviewed the entire record, including the docket of this case, *see In re Hyde*, 334 B.R. 506, 508 n.2 (Bankr. D. Mass. 2005) (a court may take judicial notice of its own records), all exhibits in evidence, and the trial testimony of each of the three witnesses.  Information that is ultimately irrelevant to my determination of these matters and would serve only to further complicate and confuse matters has been intentionally omitted and does not suggest a lack of consideration.  To the contrary, upon consideration of the entire record now before me, the following constitutes my findings of fact pursuant to Fed. R. Civ. P. 52(a)(1), made applicable to contested matters by Fed. R. Bankr. P. 7052 and Fed. R. Bankr. P. 9014(c).

## II. BACKGROUND

A. Procedural History

On January 23, 2013, the Debtor filed a voluntary Chapter 7 petition.  She resides at real

estate located at 110 Sea Shells Drive in Chatham, Massachusetts (the "Property"), which as of

the petition date was subject to the following encumbrances in order of priority:

| Holder | Lien Type | Date | Amount |
|---|---|---|---|
| HSBC Mortgage Corp. | First Mortgage | 3/22/2005 | $485,413.00 |
| HSBC Mortgage Corp. | Second Mortgage | 3/22/2005 | $99,227.00 |
| Ridgewood | Attachment | 9/14/2006 | $716,053.13 |
| NEPCO | Execution | 11/13/2007 | $797,570.34 |
| National Lumber Company ("National Lumber") | Execution | 9/26/2008 | $350,728.87 |
| Federal Tax Lien | Tax Lien | 4/29/2009 | $15,208.84 |
| Massachusetts Tax Lien | Tax Lien | 7/27/2009 | $2,000.00 |
| Nickerson Lumber Company ("Nickerson Lumber") | Execution | 9/7/2011 | $10,000.00 |
| F.D. Sterritt Lumber Company ("Sterritt Lumber") | Execution | 7/11/2012 | $18,224.21 |
|  |  | **Total:** | **$2,494,427.39** |

The values reflected in the table above are those used by the Debtor in the Lien Avoidance

Motions and, with one exception, are consistent with the proofs of claim filed in this case.[2]

Contrary to the Debtor's listing, however, Ridgewood filed a proof of claim dividing its claim

into a secured claim of $300,000.00 and an unsecured claim of $416,053.13, reflecting that it

never sought a post-judgment execution on its pre-judgment attachment.

On "Schedule A – Real Property" ("Schedule A"), the Debtor listed a fee simple

ownership interest in the Property to which she ascribed a fair market value of $980,000.00.  On

"Schedule C – Property Claimed as Exempt" ("Schedule C"), the Debtor claimed an exemption

---

[2] The Debtor overstated the Ridgewood claim by $2.00 in her motions, which I have corrected in the above table.

in the Property in the amount of $500,000.00 pursuant to Mass. Gen. Laws ch. 188, § 1 (the "Exemption").

In April, 2013, both NEPCO and Ridgewood filed objections to the Exemption, asserting the Exemption was invalid for several reasons or, in the alternative, must be limited to $155,675 pursuant to 11 U.S.C. § 522(p)(1). The Debtor filed responses and, after a hearing on June 21, 2014, I continued generally both objections in favor of addressing these issues in the context of lien avoidance under 11 U.S.C. § 522(f). By April, 2014, the Debtor filed motions to avoid NEPCO's lien (the "Motion to Avoid NEPCO Lien") and Ridgewood's lien (the "Motion to Avoid Ridgewood Lien").[3] Both NEPCO and Ridgewood filed objections reiterating their oppositions to the Exemption, and further asserting that the value of the Property was greater than the Debtor alleged. Both motions were heard separately, but ultimately were consolidated after having been taken under advisement.

On August 28, 2014, I entered a Memorandum of Decision (the "Decision") and separate order sustaining the objections in part and capping the Exemption at $155,675.00 pursuant to 11 U.S.C. § 522(p)(1).[4] I further held that an evidentiary hearing would be necessary to determine the value of the Property, but conditioned its scheduling on the Debtor first seeking to avoid the judicial liens that are junior to both NEPCO's and Ridgewood's liens.[5] I also reserved the issue of the value of Ridgewood's lien for purposes of lien avoidance for the evidentiary hearing.[6] On

---

[3] The Debtor had made two prior attempts to avoid all judicial liens in a single motion, but I denied both motions for failure to comply with various provisions of Massachusetts Local Bankruptcy Rule ("MLBR") 4003-1(a) and 11 U.S.C. § 522(f)(2)(B).

[4] *In re Dickey*, 517 B.R. 5, 23-24 (Bankr. D. Mass. 2014).

[5] *Id.* at 26.

[6] *Id.* at 26-27. As will be discussed further below, the Debtor contends that Ridgewood's lien must be valued at $716,053.13, the full amount of its unexecuted judgment, rather than the $300,000.00 pre-judgment attachment as Ridgewood suggests.

September 5, 2014, the Debtor filed a motion to avoid the liens of National Lumber, Nickerson

Lumber, and Sterritt Lumber (the "Motion to Avoid Lumber Liens").

B. The Evidentiary Hearing

On October 24, 2014, I conducted an evidentiary hearing on the Lien Avoidance

Motions.   Prior to the hearing, the Debtor filed an affidavit of valuation (the "Debtor's

Affidavit") asserting that the value of the Property was $997,500.00, while NEPCO filed an

appraisal stating a fair market value of $1,650,000.00 (the "Appraisal").  Ridgewood did not file

an appraisal, nor submit any evidence at the evidentiary hearing.   Consistent with my usual

practice, the affidavits and appraisals filed prior to the evidentiary hearing were treated as direct

testimony subject to cross-examination.   NEPCO also filed a coastal assessment report (the

"Coastal Assessment") prepared by Peter Markunas ("Markunas") of Markunas Environmental

Services.[7]

To place the issues in context, I begin with a description of the Property.  These facts are

undisputed and have been gleaned from the various documents now before me.  The Property is

a water front parcel located on a cul-de-sac in South Chatham, Massachusetts and is

approximately 26,000 square feet in size.   It contains a single family post-and-beam

contemporary style residential structure (the "Residence") that sits atop a coastal bank facing

south on the Nantucket Sound.  Built in 1982, the Residence has a living area of approximately

2,165 square feet with two fire places, four bedrooms, and three bathrooms.  The Residence

---

[7] Neither the Coastal Assessment nor Markunas' testimony at the evidentiary hearing offer any information as to
Markunas' occupation or qualifications.  Nevertheless, because both parties proceeded at the evidentiary hearing as
if Markunas was an expert witness pursuant to Fed. R. Evid. 702, I will assume for the purposes of this matter that
he is, in fact, an expert qualified to offer an opinion as  to the status of the Property's shorefront.  I further note that
he was NEPCO's witness and that NEPCO filed the Coastal Assessment prior to the hearing, while the Debtor
neither objected to the Coastal Assessment nor Markunas' testimony.  Therefore, any objection to either the Coastal
Assessment or Markunas' testimony by either party is waived.

lacks a garage, but has a basement and deck.  The Property's current tax assessed value is $1,126,900.00.[8]

The Property's beach front location is of particular importance.  According to the Coastal Assessment, the bank upon which the Residence sits is designated a "velocity zone" by the Federal Emergency Management Agency ("FEMA"), indicating that the Property is subject to flood events and additional hazards associated with storm-induced waves.[9]  The Massachusetts Coastal Zone Management Shoreline Change Rate Maps show that the Residence lays between two transects which have erosion rates of -3.84 and -4.82 feet per year, respectively.[10]  The erosion experienced by the Property is episodic, meaning that erosion occurs at a much greater amount from episodic storms that occur every few years, rather than a steady amount each year.[11]  In the 1960's, the Army Corps of Engineers constructed jetties and groins along the shoreline in response to a series of hurricanes in the prior decade as a measure to retain sediment on the beaches.  In reality, however, these structures, in particular the Red River jetty, have the unintended consequence of starving the shoreline of sediment.[12]  Nevertheless, the Property benefits from a lowland marsh adjacent to the west of the bluff which acts as a buffer for powerful waves that would otherwise damage the southwest corner of the bluff.[13]

In the Coastal Assessment, Markunas further explains that in 1999, the prior owner of the Property, Gene DeFeudis ("DeFeudis"), constructed, with authorization from the Massachusetts

---

[8] Trans. Oct. 24, 2014 at 20:16-18.

[9] Coastal Assessment, Docket No. 143 at 1.

[10] Id.

[11] Id.

[12] Id.

[13] Id.

Department of Environmental Protection ("MassDEP"), an arresting structure on the bank consisting of a two layered base of large sand-filled durabags topped with anchored fiber rolls.[14] While a rock revetment would be a more effective measure, such a coastal engineering structure is not permissible under the applicable regulations.[15]  Within a month of construction, a southerly storm damaged the integrity of the durabags.[16]  DeFeudis did not repair the damage, which caused the fiber rolls to fail and allowed the bank erode.[17]  In 2005, the Debtor obtained approval from the MassDEP to construct an eleven row high anchored fiber roll structure, but is required to place 364 cubic yards of sediment over the fiber rolls each year as a condition of the approval.[18]

Markunas estimates the cost of placing the required sediment over the fiber rolls to be approximately $11,000.00 per year.[19]  Additionally, the estimated annual cost of monitoring the shoreline erosion, which is another requirement of the MassDEP, is approximately $2,500.00.[20] Markunas also anticipates that periodic repairs of the fiber rolls will be necessary due to storm damage, but contends that the cost of such repairs cannot be accurately estimated.[21]

---

[14] *Id.* at 3.

[15] *Id.* at 2.

[16] *Id.* at 3.

[17] *Id.*

[18] *Id.*

[19] *Id.* at 10.

[20] *Id.*

[21] *Id.*

Markunas testified that he first assessed the Property in 1991 or 1992, but, to the best of his recollection, did not prepare a written assessment for DeFeudis at that time.[22]  During the course of this case, Markunas inspected the Property twice.[23]  The first visit occurred on June 9, 2013, at which time Markunas observed that: (1) due to the harsh weather conditions of the prior fall and winter, the fiber rolls were beginning to fail to the point where reconstruction must be considered; (2) most of the lower rows of fiber rolls have lost their coir material and only empty wire encasements remain; (3) the upper fiber rolls were slumping in the absence of the base level support; and (4) the re-vegetated face of the bank above the fiber rolls was shearing and an additional collapse was imminent, which would then result in a retreat of the top of the bank.[24]  Notwithstanding these observations, Markunas noted that the Debtor had been performing beach nourishment and repairs to the fiber rolls.[25]  On October 7, 2014, Markunas conducted a follow up inspection, observing that: (1) beach nourishment and fiber roll repairs have continued; (2) most of the fiber rolls have been covered by new sediment, but the exposed rolls, which looked "somewhat serviceable," have slumped; (3) the lower fiber rolls, though not visible, must be vacant due to the slumping of the upper rolls; (4) the re-vegetated face of the bank is continuing to shear, but no further shear was observed since the last inspection; (5) the southwest corner of the bluff has been reconstructed with sediment; and (6) the mean high water is several feet seaward of the base of the bank.[26]

---

[22] Trans. Oct. 24, 2014 at 34:2-13.

[23] Coastal Assessment, Docket No. 143 at 3-9.

[24] *Id.* at 3-4.

[25] *Id.* at 3.

[26] *Id.* at 6.

Based on his inspections, Markunas opined that the arresting structure has been effective to prevent erosion, but that continued maintenance, including re-anchoring of the fiber rolls, nourishing the sediment, and adjusting the filter fabric, is essential to its future viability.[27]   He further qualified his prognosis by stating that no representation could be made as to the arresting structure's effectiveness against a true hurricane event, as none have impacted the shoreline since its construction.[28]   In closing, Markunas explained that if the arresting structure experienced a catastrophic failure, due to an episodic storm event or merely reaching the end of its serviceable lifespan, a redesign and new permits would be required.[29]

According to the Debtor's unrebutted testimony, the Residence's condition has also suffered due to deferred maintenance and the harsh weather conditions in the fall of 2012 and winter of 2013.   In particular, the Debtor emphasized that all the windows and sliding doors have rotted, and must be replaced to prevent further leaking.[30]   Prior leaks have caused water damage and mold issues in the basement and upper level of the Residence which require mitigation.[31]  The exterior of the Property has rotted, causing, among other things, the retaining walls surrounding the Property to fail.[32]   The Debtor further testified that the kitchen and bathrooms need to be updated, and the hardwood floors throughout the house need to be refinished.[33]

---

[27] *Id.* at 9-10.

[28] *Id.* at 10.

[29] *Id.*

[30] Trans. Oct. 24, 2014 at 20:19-24.

[31] *Id.* at 21:3.

[32] *Id.* at 21:4-7.

[33] *Id.* at 20:24-25; 21:1.

Although I struck the undated statement of Pinsonneault Builders attached to the Debtor's Affidavit outlining the necessary repairs (the "Repair Statement") to the Property in light of their absence from the evidentiary hearing,[34] the Debtor adopted it as her own opinion based on her twenty-five years of experience in the construction business and her knowledge as the homeowner.[35]   Consequently, the Debtor asserts that the Property requires approximately $358,000.00 worth of repairs, which are itemized as follows:[36]

| | |
|---|---|
| New Windows and Sliders | $75,000.00 |
| Labor to Remove/Install [Windows and Sliders] | $35,000.00 |
| Remove/Replace Blueboard Plaster | $8,000.00 |
| Remove/Replace Hardwood at Sliders | $2,000.00 |
| Exterior Trim Replacement with Composite | $7,000.00 |
| Framing Replacement | $13,000.00 |
| Rear Deck Replacement | $45,000.00 |
| Front Steps/Walls | $25,000.00 |
| Bathroom: Complete Gut and Replace | $33,000.00 |
| Kitchen: Complete Gut and Replace | $45,000.00 |
| Contaminated Sheetrock Throughout Ceilings | $25,000.00 |
| Repaint Interior/Exterior After Mold Removal | $45,000.00 |
| **TOTAL:** | **$358,000.00** |

Although she did not mention the rear deck at the evidentiary hearing, the Repair Statement, which I reiterate the Debtor adopted as her own, indicates that it is failing.[37]  The Debtor testified that while this list was compiled in advance of the evidentiary hearing in October, 2014, all these issues existed on the petition date.[38]

---

[34] *Id.* at 15-17:1.

[35] *Id.* at 22:2-6.

[36] Ex. C, Docket No. 144.

[37] *Id.*

[38] Trans. Oct. 24, 2014 at 25:11-24.

The Debtor, who is a licensed real estate broker in Massachusetts and Rhode Island and is certified to offer broker price opinions for banks,[39] attached a comparative market analysis to the Debtor's Affidavit expressing that, in her opinion, the fair market value of the Property was $997,500.00.[40]   This number represents the average of four sales of single family properties which are all within two miles of the Property in South Chatham and took place between February and October of 2014.   While the comparative market analysis indicated the value as of October 16, 2014, the Debtor testified that the value reflected therein remained consistent with the value of the Property on the petition date.[41]

From the outset I note that none of these properties are located on the Nantucket Sound, but are instead adjacent to Taylors Pond, a salt water inlet.   The first property, 91 Juniper Lane, is a ranch style home that sold for $810,000.00, but as the Debtor concedes, that property is smaller in size.[42]   The other three properties are cape style homes.   The second property, 28 Eel River Road, sold for $870,000.00 and is also smaller, though it was recently renovated and had additional features such as air conditioning.[43]   The third property is located at 113 Taylors Pond Road and sold for $1,625,000.00.   That property is a little bigger than the Property, but was completely renovated and had different features, such as a two car garage, a walk out basement, and landscaping.[44]      Given these differences, the Debtor discounted this property to

---

[39] *Id.* at 6:19-25; 7:1-7.

[40] Ex. B, Docket No. 144.

[41] Trans. Oct. 24, 2014 at 17-15-20.

[42] *Id.* at 18:14-16.

[43] *Id.* at 18:17-19.

[44] *Id.* at 18:20-24.

$1,125,000.00.[45]   The fourth property, 183 Taylors Pond Road, is substantially bigger, newly renovated, and, in the Debtor's words, "remodeled to spectacular condition."[46]   While this property sold for $1,685,000.00, the Debtor asserts that a price adjustment to $1,185,000.00 is warranted in light of the differences between this property and the Property.[47]

As explained above, the Debtor applied price adjustments to two of the properties in light of the Property's relative condition.   She emphasized that the Property is in such a state of disrepair and in need of updating that a discount based on $358,000.00 repairs is necessary.[48] Furthermore, the Debtor credibly asserted that the Property's erosion problem and the associated maintenance is a "major factor" for the average buyer that warrants a price adjustment.[49]   Despite the necessity of these price adjustments, the Debtor's comparative market analysis does not attempt to put a dollar figure on any of the differences between the comparable properties and the Property.   Nor does she quantify what discount is warranted based on the Property's erosion issues.   The Debtor further contends that the tax assessed value is not relevant to determining the fair market value.[50]

Notwithstanding the Debtor's assertion that the Property is currently worth $997,500.00, NEPCO elicited testimony from her indicating that she has in past believed the Property to be worth considerably more.   For example, the Debtor listed the Property for sale in 2006 for

---

[45] *Id.* at 18:20-25; 19:1-3.

[46] *Id.* at 19:4-9.

[47] *Id.*

[48] *Id.* at 19:10-19; 22:2-6.

[49] *Id.* at 19:19-25; 20:1-2.

[50] *Id.* at 20:9-15.

$1,899,000.00.[51]   Additionally, on February 21, 2008, while being deposed in a fraudulent transfer action brought by Ridgewood, the Debtor testified that she thought the Property was worth $2,000,000.00.[52]   Given that the house did not sell, and that these values predate the housing market collapse and the severe weather conditions that damaged the Property, I view this testimony as irrelevant.

NEPCO submitted an Appraisal prepared by Steve Backus ("Backus") of Backus Appraisals, LLC ascribing a value of $1,650,000.00 to the Property as of January 23, 2013.[53] Backus also employed a comparable sales approach and analyzed three comparable single family properties.[54]  All three of the comparables were beach front properties on the Nantucket Sound, although two were a few miles away in Harwich Port, while the third was approximately ten miles away in South Yarmouth.[55]  Both Harwich Port properties, which sold for $2,200,000.00 and $1,745,000.00, are larger cape style homes with two car garages and larger lots.[56] Discounting these properties based on their relative size, condition, and other features including a pool, air conditioning, and superior landscaping, Backus calculated adjusted sale prices of $1,700,910 and $1,664,175.00, respectively.[57]  The South Yarmouth property, which sold for

---

[51] *Id.* at 10:16-25; 11:1-2.

[52] *Id.* at 12:3-13.

[53] Appraisal, Docket No. 142 at 2.

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

$1,200,000.00, received a positive price adjustment in light of its inferior South Yarmouth location, smaller size, and age, bringing it to $1,549,695.00.[58]

Backus built several important, and dubious, assumptions into the Appraisal. First, the Appraisal contains the following disclaimer:

> The client has requested the appraisal be based on the assumption that erosion is not a significant danger. It was beyond the scope of this report for the appraiser to make a determination about erosion. This is a drive by appraisal report, subject to erosion not being a significant value factor.[59]

At the evidentiary hearing, Backus testified that he had since reviewed the Coastal Assessment, and that Markunas' observations and conclusions do not alter his opinion as to the Property's value.[60] Second, as noted above, the Appraisal was a "drive by" report and Backus did not inspect the interior of the Property.[61] As such, Backus classified the Property's condition as "C4," meaning that the Property featured "some minor deferred maintenance and physical deterioration due to normal wear and tear," but the Residence would need only "minimal repairs."[62]

At the conclusion of the evidentiary hearing, I took the matter under advisement.

## III. DISCUSSION

### A. Law Applicable to Lien Avoidance under Section 522(f)

Section 522(f) of the Bankruptcy Code provides that a debtor may avoid the fixing of a judicial lien "on an interest of the debtor in property to the extent that such lien impairs an

---

[58] *Id.*

[59] *Id.* at 1.

[60] Trans. Oct. 24, 2014 at 29:24-25; 30:1.

[61] Appraisal, Docket No. 143 at 1.

[62] *Id.* at 2, 9.

exemption to which the debtor would have been entitled . . . ."[63]   To determine whether a

debtor's exemption is impaired, 11 U.S.C. § 522(f)(2)(A) provides the following formula:

> For the purposes of this subsection, a lien shall be considered to impair an
> exemption to the extent that the sum of –
>
> > (i) the lien;
>
> > (ii) all other liens on the property; and
>
> > (iii) the amount of the exemption that the debtor could claim if there were
> > no liens on the property;
>
> exceeds the value that the debtor's interest in the property would have in the
> absence of any liens.[64]

For purposes of this section, "'value' means fair market value as of the date of the filing of the

petition . . . ."[65]   The most junior liens must be avoided first to afford proper deference to each

lienholder's relative priority.[66]   When a property is subject to more than one lien, a lien that has

been avoided shall not be considered in the calculation with respect to the other liens.[67]

B. <u>Value of the Property</u>

From the outset, I note that determining the value of real property is more art than

science.   In the absence of a competitive buyer willing to hand over a check, and thus

definitively establish fair market value, the valuation process is inherently speculative and rarely

produces a value that is precisely accurate.   A court must simply make the best educated guess

based on the evidence before it.   Even the opinions of experienced and licensed experts, such as

---

[63] 11 U.S.C. § 522(f)(1).

[64] 11 U.S.C. § 522(f)(2).

[65] 11 U.S.C. § 522(a)(2).

[66] *In re Dickey*, 517 B.R. at 25-26.

[67] 11 U.S.C. § 522(f)(2)(B).

the ones in this case, are only as good as the assumptions upon which their opinions are built. Where an analysis relies on an inappropriate factor or otherwise fails to consider an important one, the court must assign less weight to that opinion.[68]  Ultimately, if both opinions are fatally flawed, the court may be required to reach an independent conclusion of value based upon all of the available evidence.[69]

In the present case, the primary factors effecting the value of the Property are its condition and location.  The Debtor credibly testified that the Property has suffered from deferred maintenance and severe weather damage necessitating substantial repairs.  The unrebutted evidence indicates that rot and mold are prevalent issues throughout the interior and exterior of the Residence requiring mitigation.  It is not difficult to imagine the cost of such extensive remediation to be substantial.  Moreover, preventing these issues in the future will require the replacement of all windows and sliding doors to ensure the Residence is water tight.  While $110,000.00 is a hefty price tag for such work, neither NEPCO nor Ridgewood provided any competent evidence to dispute this estimate.  I do, however, question the appropriateness of classifying $33,000.00 for a bathroom renovation and $45,000.00 for a kitchen renovation as necessary repairs.  That an otherwise functional kitchen or bathroom is not updated perhaps warrants a discount adjustment when analyzing comparable properties, but I am unconvinced that $78,000.00 is an appropriate number based on the limited record before me.  Nevertheless, I find that the Property is in need of repairs totaling at least $280,000.00.

Under normal circumstances, a beach front location would be a desirable feature demanding a premium in price.  Nevertheless, I am left with the impression that *this beach*

---

[68] *In re Kelly*, No. 12-15258-JNF, 2013 WL 6536539, *4 (Bankr. D. Mass. Dec. 13, 2013).

[69] *Id.*

15

represents a burden to the Property that would likely dissuade most prospective buyers. Markunas, who was retained by NEPCO, makes clear in the Coastal Assessment that the Property is located in a FEMA velocity zone, which is subjected to increased storm induced hazards, and suffers from a substantial erosion problem.  While the erosion rate is not constant and is dependent on episodic weather events, the Property nevertheless requires an annual sediment contribution of 364 cubic yards.  This means that even if the arresting structure is otherwise undamaged and does not require any maintenance, a homeowner is still required to pay approximately $11,000.00 for sediment and $2,500.00 for professional monitoring each year. Still, Markunas warns that repairs to the fiber rolls must be anticipated, but cannot be accurately estimated.  Thus, even in the absence of a catastrophic failure of the arresting structure caused by severe storms, preventing the erosion of the bank upon which the Residence sits is an expensive obligation.

That said, the Coastal Assessment was not all "doom and gloom."  Despite the almost immediate damage to the arresting structure upon its completion, DeFeudis' failure to repair it, and the Debtor's own deferred maintenance, Markunas states that the arresting structure has been effective to prevent further erosion to the upper bank.  He further opined that so long as it maintained appropriately, which includes the annual sediment contribution and monitoring, the arresting structure would continue to be effective until the end of its serviceable life.  Therefore, barring a catastrophic storm event, one can reasonably expect that with annual maintenance, regular erosion should not threaten the Residence.

With these considerations in mind, I turn to the value opinions now before me.  Given that Backus did not inspect the interior of the Residence and assumed that erosion is not a significant danger, the Appraisal does not take into account the two most important value factors

at play in this case.  Additionally, the use of only three comparable properties to determine an average value is also a weakness in the Appraisal.  Notwithstanding these defects, I find that the comparable properties he analyzed to be appropriately similar with necessary discount adjustments made to reflect differences in the properties' features.  Of particular relevance is that these properties, despite being further away from the Property than the comparable properties employed by the Debtor, are beach front on the Nantucket Sound.

The Debtor's value opinion has weaknesses as well.  First, the Debtor's comparable market analysis utilizes sales from over a year after the petition date.  While the Debtor testified that the value of the Property has not changed much since then, her claim is at least unsupported. Second, none of the Debtor's comparable properties are located on the Nantucket Sound, but are instead adjacent to Taylors Pond.  Third, unlike the Appraisal, the Debtor does not expressly apply discount adjustments based on dissimilar features, but instead merely applied a $500,000.00 discount to her two comparable properties priced over $1,000,000.00.  Curiously, there was no upward price adjustment applied to either the 91 Juniper Lane property or 28 Eel River Road property, both of which sold in the $800,000.00 range, despite both being significantly smaller than the Property.  Upon further inspection, I question whether either of these properties is actually comparable to the Property.

Ultimately, neither of these opinions is adequate and I must perform my own analysis from the available evidence.  As a reasonable starting point, I will take the comparable properties analyzed by Backus, to which I otherwise had no quarrel, and apply discount adjustments based on the condition of the Property and the erosion issue.  As explained above, I conclude that the Property requires at least $280,000.00 in repairs.  The erosion issue is more difficult, as no expert has suggested how to quantify its effect on the Property's value.  In the absence of any guidance,

I find that a $120,000.00 price adjustment to Backus' comparable properties is warranted in light of the Property's erosion problem. This finds at least some support in the Debtor's Affidavit where she applied discounts of $500,000.00 to the Taylors Pond Road properties--$358,000.00 of which would have been attributable to repairs and upgrades, leaving $142,000.00 for differences in features and erosion maintenance. As the Debtor's Taylors Pond Road properties were already subjected to discount adjustments of $500,000.00, I will assume that no other adjustment is necessary.

| Property | Expert Adjusted Sale Price | Discounts Attributable to Repairs and Erosion Maintenance | Court Adjusted Sale Price |
|---|---|---|---|
| 18 Saquatucket Point Harwich Port, MA | $1,700,910.00 | $280,000.00 (Repairs) $120,000.00 (Erosion) | $1,300,910.00 |
| 7 Nons Road Harwich Port, MA | $1,664,175.00 | $280,000.00 (Repairs) $120,000.00 (Erosion) | $1,264,175.00 |
| 33 Shore Side Road South Yarmouth, MA | $1,549,695.00 | $280,000.00 (Repairs) $120,000.00 (Erosion) | $1,149,695.00 |
| 113 Taylors Pond Road South Chatham, MA | $1,125,000.00 | --- | $1,125,000.00 |
| 183 Taylors Pond Road South Chatham, MA | $1,185,000.00 | --- | $1,185,000.00 |

Thus, taking the average adjusted sale price of these five comparable properties, I find that the value of the Property as of the petition date was $1,204,956.00. In closing, I note that while I do not rely on the tax assessed value, which is $1,126,900.00, it at least suggests that my valuation is not unsupportable.

C. Value of Ridgewood's Lien

Despite the fact that Ridgewood filed a proof of claim asserting a secured claim in the amount of $300,000.00, the amount of its pre-judgment attachment, the Debtor asserts that its full judgment amount of $716,053.13 should be used to calculate the impairment of the Exemption under 11 U.S.C. § 522(f)(2)(A). She reasons that, in order to levy against the

18

Property, Ridgewood would first need to obtain an execution in the full amount of its judgment, making that the appropriate figure.  I previously deferred ruling on this issue, reasoning that unless the Property was worth more than $1,057.523.84, the sum of the Ridgewood Lien valued at $300,000.00, the non-judicial liens, and the Exemption, the issue would be moot.[70]  Now that I have found that the fair market value of the Property is $1,204,956.00, this issue is ripe for determination.

Having considered the Debtor's arguments, I conclude that use of the full value of Ridgewood's judgment for purposes of lien avoidance under 11 U.S.C. § 522(f) is unwarranted. Ridgewood did not execute on its judgment prepetition, and now the automatic stay bars it from doing so.[71]  By virtue of this inaction, Ridgewood now holds, consistent with its proof of claim, a secured claim in the amount of its pre-judgment attachment, and an unsecured claim for the balance of its judgment.   Any unpaid balance of Ridgewood's unsecured claim will be discharged along with the Debtor's other unsecured debts, while Ridgewood's *in rem* rights as defined by its pre-judgment attachment will be unaffected by the discharge.[72]  As a practical matter, the sheriff would simply be limited to executing against the non-discharged portion of the judgment.

D. Avoidance of Liens

Applying the formula in 11 U.S.C. § 522(f)(2)(A) to the liens beginning with the most junior lien yields the following results:

---

[70] $300,000.00 (the Hypothetical Value of the Ridgewood Lien) + $485,413.00 (the first mortgage) + $99,227.00 (the second mortgage) + $15,208.84 (the federal tax lien) + $2,000.00 (the Massachusetts tax lien) + $155,675.00 (the Exemption)  = $757,523.84.

[71] 11 U.S.C. § 362(a)(4),(5).

[72] *See Johnson v. Home State Bank*, 501 U.S. 78, 81 (1991).

1. The Sterritt Lumber Lien

| The Subject Lien | Sterritt Lumber | $18,224.21 |
|---|---|---|
| All Other Liens | HSBC Mortgage Corp. | $485,413.00 |
| | HSBC Mortgage Corp. | $99,227.00 |
| | Ridgewood | $300,000.00 |
| | NEPCO | $797,570.34 |
| | National Lumber | $350,728.87 |
| | Federal Tax Lien | $15,208.84 |
| | Massachusetts Tax Lien | $2,000.00 |
| | Nickerson Lumber | $10,000.00 |
| The Debtor's Exemption | | $155,675.00 |
| | SUBTOTAL: | **$2,234,047.26** |
| Value of the Property | | $1,204,956.00 |
| Impairment | | **$1,029,091.26** |

Given that the impairment is greater than the value of the Sterritt Lumber lien, it is avoidable in its entirety.

2. The Nickerson Lumber Lien

| The Subject Lien | Nickerson Lumber | $10,000.00 |
|---|---|---|
| All Other Liens | HSBC Mortgage Corp. | $485,413.00 |
| | HSBC Mortgage Corp. | $99,227.00 |
| | Ridgewood | $300,000.00 |
| | NEPCO | $797,570.34 |
| | National Lumber | $350,728.87 |
| | Federal Tax Lien | $15,208.84 |
| | Massachusetts Tax Lien | $2,000.00 |
| The Debtor's Exemption | | $155,675.00 |
| | SUBTOTAL: | **$2,215,823.05** |
| Value of the Property | | $1,204,956.00 |
| Impairment | | **$1,010,867.05** |

The impairment is greater than the value of the Nickerson Lumber lien and therefore, it is avoidable in its entirety.

### 3. The National Lumber Lien

| The Subject Lien | National Lumber | $350,728.87 |
|---|---|---|
| All Other Liens | HSBC Mortgage Corp. | $485,413.00 |
| | HSBC Mortgage Corp. | $99,227.00 |
| | Ridgewood | $300,000.00 |
| | NEPCO | $797,570.34 |
| | Federal Tax Lien | $15,208.84 |
| | Massachusetts Tax Lien | $2,000.00 |
| The Debtor's Exemption | | $155,675.00 |
| | SUBTOTAL: | **$2,205,823.05** |
| Value of the Property | | $1,204,956.00 |
| Impairment | | **$1,000,867.05** |

The impairment is greater than the value of the National Lumber lien and thus it is avoidable in its entirety.

### 4. The NEPCO Lien

| The Subject Lien | NEPCO | $797,570.34 |
|---|---|---|
| All Other Liens | HSBC Mortgage Corp. | $485,413.00 |
| | HSBC Mortgage Corp. | $99,227.00 |
| | Ridgewood | $300,000.00 |
| | Federal Tax Lien | $15,208.84 |
| | Massachusetts Tax Lien | $2,000.00 |
| The Debtor's Exemption | | $155,675.00 |
| | SUBTOTAL: | **$1,855,094.18** |
| Value of the Property | | $1,204,956.00 |
| Impairment | | **$650,138.18** |

Because the impairment is less than the total value of the NEPCO lien, it is avoidable only to the extent of $650,138.18.  Thus, NEPCO's lien survives to the extent of $147,432.16.

5. The Ridgewood Lien

| The Subject Lien | Ridgewood | $300,000.00 |
|---|---|---|
| All Other Liens | HSBC Mortgage Corp. | $485,413.00 |
| | HSBC Mortgage Corp. | $99,227.00 |
| | Federal Tax Lien | $15,208.84 |
| | Massachusetts Tax Lien | $2,000.00 |
| The Debtor's Exemption | | $155,675.00 |
| | SUBTOTAL: | **$1,057,523.84** |
| Value of the Property | | $1,204,956.00 |
| Impairment | | **$0.00** |

The Ridgewood lien does not impair the Debtor's exemption and is therefore unavoidable.

## IV. CONCLUSION

In light of the foregoing, I will enter an order granting the Motion to Avoid Lumber Liens, granting in part and denying in part the Motion to Avoid NEPCO Lien, and denying the Motion to Avoid Ridgewood Lien.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: January 15, 2015

Counsel Appearing:

    Amy Lee Lipman-White, Law Office of Lipman & White, Hanover, MA,
        for the Debtor
    Thomas J. Raftery, Raftery Law Offices, North Chatham, MA,
        for New England Phoenix Co., Inc.
    Christopher Condon, Murphy & King, P.C., Boston, MA
        for Ridgewood Partners, LLC